UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH BARKER and YADIRA ESQUEDA, individually and on behalf of all others similarly situated,<br><br>　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>U.S. BANCORP, a corporation,<br><br>　　　　　　　　　　　Defendant. | Case No.: 3:15-cv-1641-CAB-WVG<br><br>**ORDER ON DEFENDANT'S MOTION FOR DECERTIFICATION OF COLLECTIVE ACTION**<br>**[Doc. No. 74]** |

This matter is before the Court on Defendant's motion for Decertification of Collective Action Under the Fair Labor Standards Act. [Doc. No. 74.] The Court finds the matter suitable for determination on the papers submitted in accordance with Civil Local Rule 7.1(d)(1). For the reasons set forth below, the Court grants the motion.

**I.　Background**

On July 23, 2015, Plaintiff Elizabeth Barker filed a complaint against U.S. Bancorp. ("Defendant" or "U.S. Bank") alleging violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), various California labor code and wage orders, and the California Unfair Business Practices Act, codified at Business and Professions Code §§

17200, et seq. [Doc. No. 1.] Subsequently, Plaintiff sought and was granted leave to add another Plaintiff, Yadira Esqueda, to this action. [Doc. Nos. 20, 39.]

Plaintiffs are former employees of U.S. Bank[1], who previously worked as In-Store Branch Managers ("IBM") at different in-store branch locations. U.S. Bank classified Plaintiffs and other IBMs as exempt employees, meaning that they were not paid overtime. U.S. Bank has employed at least 1,486 IBMs nationwide since July 23, 2012. [Doc. No. 18-5 at ¶4.]

Plaintiffs allege that during their tenures they performed identical and routine job duties in accordance with U.S. Bank's allegedly uniform and detailed guidelines. Further, Plaintiffs claim that their exempt status was improper because they spent more than half their time performing non-managerial duties similar to those of a "universal banker," which is a non-exempt position.

On March 24, 2016, Plaintiff moved for conditional certification of the collective. [Doc. No. 18.] On September 28, 2016, the undersigned granted Plaintiff's motion and conditionally certified the collective action. [Doc. No. 39.] The Court conditionally certified a collection action under the FLSA consisting of "[a]ll persons currently or formerly employed by U.S. Bancorp in the United States as an In-Store Branch Manager or any other similar position and classified as exempt at any time since July 23, 2012. [*Id.* at 11:20-23.][2] Since conditional certification, over 500 Branch Managers have filed consents to join the lawsuit. [Doc. No. 69.]

On March 16, 2017, Plaintiffs filed a motion for Class Certification under Rule 23 of the Federal Rules of Civil Procedure [Doc. No. 56] that was denied by the Court [Doc. No. 71].

---

[1] Plaintiffs declare that U.S. Bank operates several hundred in-store branches in large grocery stores nationwide. In-store locations are typically opened seven days a week and provide full-service banking operations. Customers, for example, can open checking accounts, transact business on savings, CDs, IRAs and other investment opportunities, or get a loan for a car, mortgage, boat, home improvement or debt consolidation. [Doc. No. 18-3 ("Barker Decl.") ¶ 4; Doc. No. 18-4 ("Esqueda Decl.") ¶ 4.]

[2] Page cites refer to the CM/ECF assigned page designations at the top of the docketed document

1    On July 26, 2017, Defendant filed a motion for Decertification of Collective Action Under the Fair Labor Standards Act. [Doc. No. 74.] Plaintiffs filed their response [Doc. No. 76] and Defendant filed its reply [Doc. No. 77.]

## II.     Legal Standard

The FLSA provides for a private right of action to enforce its provisions "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). However, "[n]either the FLSA, nor the Ninth Circuit, nor the Supreme Court has defined the term 'similarly situated.'" *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 607 (E.D. Cal. 2015). Thus, "courts in the Ninth Circuit have used an *ad hoc* two–tiered approach to decide if plaintiffs are similarly situated." *Talavera v. Sun-Maid Growers of Cal.*, No. 1:15cv00842 DAD SAB, 2016 WL 1073253, at *2 (E.D. Cal. Mar. 18, 2016). "At the first stage, or the 'notice' stage, the court makes an 'initial determination' whether to conditionally certify the class in order to notify potential class members. At the second stage, typically after the close of discovery, the court re-evaluates certification and applies a more rigorous analysis." *Kellgren v. Petco Animal Supplies, Inc.*, No. 13cv644 L KSC, 2015 WL 5167144, at *2 (S.D. Cal. Sept. 3, 2015) (internal citation omitted).

At the second stage, which is at issue here, the party opposing class certification may move to decertify the class. *Reed v. Cnty. of Orange*, 266 F.R.D. 446, 449 (C.D. Cal. 2010). The court then must make a factual determination regarding the propriety and scope of the class and must consider the following factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations. *Pfohl v. Farmers Ins. Grp.*, 2004 WL 554834, *2–3 (C.D. Cal. Mar. 1, 2004) (citing *Thiessen v. Gen. Electric Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir.2001)). However, the second-stage analysis is still "considerably less stringent than the requirement of Rule 23(b)(3) that common questions predominate." *Stiller v. Costco*

*Wholesale Corp.*, 298 F.R.D. 611, 630-31 (S.D. Cal. 2014) (internal quotation marks and citations omitted).

"Ultimately, the decision whether to proceed as a collective . . . . turns on whether this device is the superior way of resolving a controversy. The benefits to the parties of a collective proceeding need to be balanced against the prejudice to the defendant and any problems of judicial administration that may surface." *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011) (citation omitted). "Determining whether a collective action is appropriate is within the discretion of the district court." *Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004). Should the court determine on the basis of the complete factual record that the plaintiffs are not similarly situated, then the court may decertify the class and dismiss the opt-in plaintiffs without prejudice. *Id.* at 467.

### III. Discussion

Defendant moves to decertify the collective action arguing: (1) there is no evidence that a uniform policy caused Plaintiffs' alleged injuries; (2) the Plaintiffs worked in disparate factual and employment settings; (3) U.S. Bank has individualized defenses to Plaintiffs' claims that cannot be resolved collectively; and (4) collective treatment is neither fair nor efficient given the facts in evidence. [Doc. No. 74-1.]

**A. The Disparate Factual and Employment Settings of the Individual Plaintiffs**

The first factor involves evaluating Plaintiffs' factual and employment settings. *Reed,* 266 F.R.D. at 450. This requires the Court to look at whether plaintiffs had differing job titles or duties, worked in different geographical locations, worked under different supervisors. *Id.* In FLSA misclassification cases "the focus is not on [the employer's] action, but instead on the nature of the employee's job duties in the context of the relevant exemption criteria." *Morisky v. Pub. Serv. Elec. and Gas Co,* 111 F. Supp. 2d 493, 498 (D.N.J. 2000). "Courts also evaluate whether plaintiffs have provided substantial evidence that their claims arise out of single policy, custom or practice that leads to FLSA violations." *Reed,* 266 F.R.D at 450 (citing *Smith v. T-Mobile USA Inc.,* Case No. 05-

4

3:15-cv-1641-CAB-WVG

5274 ABC (SSx), 2007 WL 2385131, at *6-8 (C.D. Cal. Aug. 15, 2007)). But "an allegation of an 'overarching' policy is generally insufficient; plaintiffs must produce 'substantial evidence' of a 'single decision, policy or plan.'" *Smith v. Micron Elecs., Inc.,* Case No. CV-01-244-S-BLW, 2005 WL 5336571, at *2 (D. Idaho Feb. 4, 2005).

Defendant argues that the Court's earlier finding that Plaintiffs had essentially conceded that U.S. Bank's "policies did not cause all IBMs to spend more than 50% of their time on nonexempt tasks" is dispositive and should be applied here. Further, Defendant argues that during their depositions named Plaintiffs testified to differences in how they spend their time at work, and the depositions of seven opt-in Plaintiffs highlight their unique experiences as IBMs, illustrate significant variations in how they execute their duties, and spend their work time. Defendant contends that each IBMs experience varies depending on a myriad of factors, which in turn illustrate that each Plaintiff is not similarly situated.

In response, Plaintiffs assert that U.S. Bank had a companywide policy of: (1) staffing its in-store branches nearly identically; (2) setting in –store branch hours nearly identically; (3) did not adjust branch goals if the branch was short a banker; and (4) IBMs performed banking duties for absent bankers.[3] [Doc. No. 76 at 5.] Plaintiffs posit that these policies resulted in a misclassification of bankers as IBMs because under these policies IBMs are required to perform Banker Duties. However, Plaintiffs concede that this "uniform policy may not affect each IBM and thus the resulting alleged misclassification applies to a smaller collective than that currently conditionally certified."

---

[3] In opposing the motion Plaintiffs make no mention of U.S. Bank's policy of classifying IBMs as exempt based solely upon their job title so the Court will not consider it within this order. Even if they claimed the existence of such a blanket classification policy "an analysis of what job duties each employee actually performed is more probative than an employer's classification policy when considering whether plaintiffs are similarly situated." *Benedict v. Hewlett-Packard Co.,* Case No. 13-cv-00119-BLF, 2016 WL 3742342, at *7 (N.D. Cal. July 13, 2016) (quoting *Beauperthuy*, F. Supp. 2d at 1131). *See also In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) ("The fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties.")

[Doc. No. 76 at 5.] As a result of this concession, Plaintiffs are requesting the Court limit the collective definition to:

> All current and former U.S. Bank In-Store Branch Managers who, at any time since three years prior to opting into the lawsuit, were (1) classified as exempt from overtime; and (2) worked in a branch short one or more banker for any period of time greater than one week.

Plaintiffs also counter that the evidence establishes IBMs are similarly situated.

Setting aside the propriety of such a request, Plaintiffs' narrower collective definition does not save it from the same fate that would have befallen the larger collective. Regardless of collective size, Plaintiffs have not offered substantial evidence of a companywide, uniformly enforced policy of improperly classifying IBMs as exempt employees. Rather, Plaintiffs have offered twenty-nine (29) 2-3 page "fill in the blank" declarations from numerous opt-in Plaintiffs. [Doc. No. 76-1 at 57-143.] The only information that changes between declarations is the name, branch location, number of hours worked, and employment dates of the declarant. Not only is the Court hard pressed to imagine a circumstance where 29 branch managers have identical experiences and describe them in exactly the same words, the uniformity of the declarations provide little insight into the declarants actual duties and experiences. Thus the Court affords them little weight as these "boilerplate statements which call into question the declarations' credibility and whether they are actually based on personal knowledge [] do not constitute substantial evidence that Plaintiffs' claims arise out of single policy, custom, or practice that resulted in FLSA violations." *Alaniz v. City of L.A.*, CV 04-04-8592 GAF(AJWx), CV 07-6782 GAF (AJWx), 2014 WL 12694157, at *5 (C.D. Cal. May 21, 2014) (internal quotation marks and citation omitted). Even if taken at face value, the declarations of the 29 IBMs and two named Plaintiffs do not support a finding that the hundreds of other IBMs

employed by U.S. Bank to manage the 734 in-store branches it owns across the country were subject to widespread misclassification.[4]

Moreover, the deposition testimony before the Court does not does not support the conclusion that uniformed, companywide enforced policies existed. As to the policy of staffing "its in store branches nearly identically" there is conflicting testimony. For example, Aguillar testified to employing one full time and two part time employees at her in-store branch and that her branch normally employs more than four full time employees. [Doc. No. 74-3 at 43], while Bullock stated that the staffing of the Mira Mesa branch ranged from being fully staffed with five full time employees (including himself) to having just four and that he's usually had at least two full time employees reporting to him as a branch manager. [*Id.* at 111, 141.] Relatedly, Dancoe testified that at the in-store branch she managed the full-time employees fluctuated from being as low as two to being fully staffed with four (not including herself) [*Id.* at 161] and Esqueda worked alongside two to four full time employees during her tenure [*Id.* at 176,189].

Similarly, Plaintiffs have not established the existence of a policy of "setting in-store branch hours nearly identically." Aside from the deposition testimony of opt-in Plaintiff Kelly, and two declarations, there is no other evidence before the Court that supports this assertion. The twenty nine declarations submitted by Plaintiff showing varying numbers of days and hours worked per week by the IBMs which in turn do not support the conclusion that all in-store branch hours were nearly identical. Likewise, the existence of a U.S. Bank policy requiring branch managers to perform absent banker duties is not borne out by the evidence. The Court has not been presented with a written policy requiring an IBM perform these duties and, although four opt-in Plaintiffs have testified that they performed banker duties, when read as a whole the testimony reflects their personal

---

[4] *See* Doc. No. 18-5 at ¶4 (U.S. Bank has employed at least 1,486 IBMs nationwide since July 23, 2012); Doc No. 76-1 ("Brown Decl.") at ¶ 2 ("U.S. Bank currently operates 734 of these "in-store branches across the country").

decisions in certain situations and does constitute substantial evidence. As to U.S. Bank's alleged policy of "not adjust branch goals if the branch was short a banker," Plaintiffs rely solely on the deposition testimony of two opt-in Plaintiffs, but this falls short of Plaintiffs' burden of producing substantial evidence of a policy.[5]

In sum, Plaintiffs have simply made generally conclusory allegations regarding overarching policies based on carefully chosen deposition excerpts without producing "'substantial evidence' of a 'single decision, policy or plan.'" *See Smith,* 2005 WL 5336571 at *2. On the record before it, the Court finds that there was no single, uniform policy of misclassification and that the absence of a policy weighs in favor of decertification. *See Beauperthuy* 772 F. Supp. 2d at 1129 (noting that courts within the Ninth Circuit have found "certification is not warranted in the absence of proof that plaintiffs' alleged injuries resulted from a single, unified policy.")

Additionally, the Court concludes that determining each Plaintiff's primary duty[6] requires individualized inquiries and fact-specific analysis in order to establish misclassification and that their disparate employment settings weigh in favor of decertification. The small sampling of teller reports Defendant provided to the Court are illustrative of how varied each IBMs day could be, on any given day an IBM could perform

---

[5] The Court notes that in the analysis section of their opposition it states "the common policies resulting in the misclassification are as follows:" but no further details are provided in the brief. [Doc. No. 76 at 15.]

[6] The "primary duty is the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The determination of what an employee's primary duty is "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* When determining the primary duty of an employee courts should consider "the relative importance of the exempt duties as compared with other types of duties, the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* However, while time spent performing exempt work can by a useful guide, "nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other facts support such a conclusion." 29 C.F.R. § 541.700(b).

teller transactions ranging in number from 0 to over 50. [Doc. 74-2 at 29-109.] Likewise, the LinkedIn profiles of various IBMs reveal a wide range of job duties and responsibilities that are indicative of individualized experiences. [Doc. No. 74-2 at 111-158, Doc No 74-3 at 1-17.] Further, Defendant has presented the Court with excerpts of the deposition transcripts of Plaintiffs Aguilar, Barker, Bullock, Dancoe, Esqueda, Herrera, Kelly, Porter, and Tew. [Doc. No. 74-3 at 29 – 309.] All describe their IBM duties differently, how they worked in different geographical locations, under different supervisors, and are subject to varying work conditions. *Reed,* 266 F.R.D. at 450. The differences in duties and responsibilities depend on the IBMs individual experience and personal preference, the number of branches they manage, whether they have extra management responsibilities, the number and experience of the staff at the ISB, the transaction volume, clientele and location of their branch, and the expectations of their supervisors. [*See, e.g.,* Doc No. 74-3, Aguillar Depo at 43, 53, 73-75, 78-83; Bullock Depo at 114, 116, 127, 130-33, 141, 143; Danco Depo at 149-50, 157-61*;* Herrera Depo at 196-97, 202, 205-06, 210, 219-20, 224, 230-233; Kelly Depo at 238,241-43, 245-49, 251-253, 257-260; Porter Depo at 267, 269-271, 273-74, 280-84, 289; Tew Depo at 294, 295-97, 299-304, 307-308.] All of the opt-in deponents testified as to how their experiences were fluid and constantly changing depending on the circumstances, with most agreeing that at least 50% of their time was spent on managerial-type tasks and all agreeing that many tasks required them to exercise their own discretion and judgment.[7] [*Id.*] In sum, "[f]or every manager who says one thing

---

[7] There is also conflicting evidence concerning the duties, responsibilities and level of discretion exercised by the named Plaintiffs while employed as IBMs. *Compare* Doc. No. 76-1 ("Barker Decl.) at 5- 17 (¶5 "spent majority of time working in the front lines; ¶ 8 managerial tasks took less than 20% of her time and did not permit the exercise of discretion and judgment; ¶ 9 tasks requiring minimal time to complete) *with* Doc. No. 74-3 (Barker Depo Excerpts) at 91-103 (page 93 "a manager can use [] discretion;" page 96 Q: What do you think was your primary duty as a branch manager? A: my duties as a manager is to oversee the branch. I mean the daily operations of the branch to make sure clients are serviced, transactions are followed … that we're following policy, procedure, so I am responsible for that branch, anything that happens in that branch, good or bad; page 96 Q: Did you have the ability to structure your day, and what you did during the day in whatever manner you wanted to? A: Yes.; page 97 Q: Do you think the job required you to use judgment? A. Yes,; page 103 Q:So would you agree with me that as long as you're

about his or her job duties and responsibilities, another says the opposite." *Beuaperthuy*, 772 F. Supp. 2d at 1130-31. This wide variation in Plaintiffs' descriptions of their job duties and responsibilities is indicative of the fact that Plaintiffs' misclassification claims are not well-suited for collective action treatment and that the members of the collective are not similarly situated.

### B. The Various Defenses Available to the Defendant with Respect to the Individual Plaintiffs

The second factor requires the Court to analyze whether "this action should proceed as a collective action is the available defenses that need to be litigated on an individual basis." *Reed*, 266 F.R.D. at 460. Defendant contends that each of its defenses: individualized exemption under either the executive or administrative provisions, whether any one Plaintiff worked overtime, and each Plaintiff's credibility - must be adjudicated individually, Plaintiff-by-Plaintiff. Plaintiffs summarily dismiss Defendant's assertions, concluding that "for an extended period of time (weeks or month), IBMs were performing the job of the missing banker. Thus, the duties at issue are the banker duties – which is a non-exempt position. USB will be able to present all of its own evidence on the issue at trial." [Doc. No. 76 at 16.]

---

in the bank branch, you're constantly managing, coaching, and supervising your employees? A: That's correct.).

Also *compare* Doc. No. 76-1 ("Esqueda Decl.") at 18-30 (page 19 at ¶1"spent the vast majority of my time working in the front lines"; page 20 at ¶ 8 managerial tasks took less than 20% of her time and did not permit the exercise of discretion and judgment; pages 21- 28 ¶ 5 tasks requiring minimal time to complete) *with* Doc. No. 74-3 (Esqueda Depo Excerpts) at 172-191 (page 177 Q: And you as branch manager have the ultimate responsibility in that branch to make sure it runs soundly, don't you? A: Yes.; page 181 Q: But you as a branch manager had the discretion to figure out how to meet those [U.S. Bank] standards, didn't you? A: Yes.; page 182 Q: So you had the discretion to determine how best to meet those sales goals for your branch, didn't you? A. Yes…. Q: Did anybody ever give you a list of everything that you personally needed to accomplish each day? A. No.; page 183 for a list of Esqueda's responsibilities; page 190 Q: Did you think that your primary job was to be the manager of the bank branch? A. I understood that I had to be the manager. Was I able to do it? Not to the full capacity as described on the job description.)

Under the FLSA, determining whether an employee qualifies as exempt requires analyzing what the employee's primary duties are. The evidence currently before the Court demonstrates that there is little to no uniformity in how the deposed Plaintiffs' characterized their primary duties. Each Plaintiff described their primary duties differently, expressed varying amounts of time spent performing the same tasks, provided fluctuating estimates regarding the amount of time they spend fulfilling managerial tasks, and inconsistently reported the degree of discretion and independent judgment they exercised. "In light of these discrepancies, representative testimony would be inadequate to determine whether Plaintiffs were properly categorized as exempt." *Beauperthuy,* 772 F. Supp. 2d at 1133. Furthermore, to rebut Plaintiffs' allegations of misclassification, under either exemption analysis, Defendant will have to introduce evidence that is inherently individualized because determining whether Plaintiffs are exempt is fact specific. *See, e.g., Santiago v. Amdocs, Inc.,* No. C 10-4317 SI, 2013 WL 5444324, at *7 (N.D. Cal. Sept. 30, 2013) ("a determination whether class members qualify for FLSA overtime exemptions will necessitate an individualized inquiry into the circumstances of each Plaintiff.") "Accordingly, '[t]he proof required to establish these individualized [] exemption defenses would become the overwhelming focus of a trial,' resulting in the equivalent of mini-trials for each plaintiff." *Beauperthuy,* 772 F. Supp. 2d at 1126-27 (quoting *Johnson v. TGT Precision Haircutters,* No. Civ.A. H-0303641, 2005 WL 1994286 at *6 (S.D. Tex. Jan. 15, 2008)).

Additionally, determining how much, if any, overtime any one Plaintiff worked depends on several individualized facts, including whether they worked over 40 hours per week, the amount of overtime worked, and if their manager knew or should have known of the work. *See, e.g., Espinoza v. Cnty. of Fresno*, 290 F.R.D. 494, 504 (E.D. Cal. 2013) (differences in damages can be symptomatic of the fact that Plaintiffs are truly not similarly situated). In the same manner, U.S. Bank's ability to determine whether individual opt-in claimants are credible necessitates "questioning those Opt-ins about contradictory responses given when providing declarations, interrogatory answers, and deposition

testimony. Such individual questioning would likely make it difficult and confusing for the fact finder to make both credibility determinations and to discern whether each individual Opt-In is exempt under the FLSA." *Aquilino v. Home Depot, U.S.A., Inc.*, 2011 WL 564039, at *9 (D.N.J. Feb. 15, 2011).

In light of the above, the Court finds that the individualized defenses for each opt-in Plaintiff weighs against continued certification.

### C. Fairness and Procedural Considerations

"In evaluating fairness and procedural considerations, the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Beauperthuy*, 772 F. Supp. 2d at 1127 (citations omitted). Additionally, "the Court must also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Reed*, 266 F.R.D at 458.

Defendant argues a collective trial would be neither fair nor efficient because answers to key questions rest on individualized evidence. Defendant asserts that individualized questions cannot be resolved using representative testimony. In response, Plaintiffs argue that fairness considerations weigh in favor of allowing the lawsuit to proceed collectively.

Although continued the FLSA certification would conserve judicial resources and significantly lower the burden on individual opt-in claimants, the Court stands by its earlier finding that "the determination of whether an IBM actually spent more than 50% of her[/his] time on non-exempt tasks and was misclassified as exempt requires the presentation of evidence that varies from member to member." Doc. No. 71 at 6:23-25 (internal quotation marks and citation omitted). Given the need for such individualized inquiries and the lack of substantial evidence that Plaintiffs were subject to a uniform decision, policy or practice of misclassification, the Court is persuaded that "proceeding collectively would be 'unmanageable, chaotic, and counterproductive.'" *Beauperthuy,* 772

F. Supp. 2d at 1128 (quoting *Reed,* 266 F.R.D. at 462.). Accordingly, the Court finds this factor weighs in favor of decertification of the collective.

### IV. Conclusion

For the foregoing reasons, the Court **GRANTS** the Motion to Decertify the Collective. [Doc. No. 74.] All opt-in Plaintiffs are **DISMISSED** from this action **WITHOUT PREJUDICE** to each opt-in Plaintiff filing a suit on his/her own behalf. To avoid prejudice to individual opt-in Plaintiffs who may choose to file their own cases, the Court invokes its equity powers to toll the applicable statutes of limitations for 30 days after the entry of this Order.

**IT IS SO ORDERED**.

Dated: October 2, 2017

_____
Hon. Cathy Ann Bencivengo
United States District Judge